**In Re Anonymous No. 49 D.B. 80**

Disciplinary Board Docket no. 49 D.B. 80.

PEARLSTINE, *Vice Chairman*, September 29, 1982—Pursuant to Rule 208(d) of the Pennsylvania Rules of Disciplinary Enforcement, The Disciplinary Board of the Supreme Court of Pennsylvania submits its findings and recommendations to your honorable court with respect to the above petition for discipline.

## I. HISTORY OF PROCEEDINGS.

On September 24, 1980, a petition for discipline was filed by the Office of Disciplinary Counsel, charging respondent with violating eight counts of The Disciplinary Rules of the Code of Professional Responsibility, in that:

1. He simulated the signature of a deceased client in order to effectuate a settlement with a casualty insurance carrier for litigation following an accident to the deceased claimant.

2. Misrepresented to the insurance company that the proceeds of the lawsuit were an asset of an inter-vivos trust and not an asset of decedent's estate.

3. Backdated a purported amendment to the trust agreement and simulated the signature of decedent to that document dated after the date of death of the deceased settlor.

4. Procured letters of administration and caused his client to falsely swear that decedent died intestate, when, in fact, he knew a will, which he had prepared, was in existence.

No answer was filed by respondent, but counsel entered an appearance on his behalf.

The matter was referred to hearing committee [    ] ([    ] County).

Hearings were held on June 9, June 10, June 23, and July 9, 1981. All in all, five volumes of testimony, composed of 642 pages, with a record of 32 written exhibits, were heard, examined, and considered by the hearing committee, consisting of [   ]. [   ] was unavailable for the first hearing, and the parties consented to have the matter heard by the two remaining hearing committee members.

Counsel briefed the matter, and on February 9, 1982, they presented oral argument on the merits.

The hearing committee concluded that respondent had violated the following Disciplinary Rules:

D.R. 1-102(A)(6) in that his conduct adversely reflected on respondent's fitness to practice law.

D.R. 7-102(A)(4) in that he knowingly used false evidence.

D.R. 7-102(A)(6) in that he created evidence known to be or which was obviously false.

D.R. 1-102(A)(4) in that his conduct involved dishonesty, fraud, deceit, or misrepresentation.

D.R. 1-102(A)(6) in that his conduct adversely reflected on respondent's fitness to practice law.

D.R. 7-102(A)(3) in that respondent's conduct concealed or knowingly failed to disclose that which is required by law to be revealed.

D.R. 7-102(A)(5) in that respondent knowingly made a false statement of law or fact.

With respect to the signing of the [A] release, the hearing committee concluded that the Disciplinary Counsel had not sustained its charge that respondent violated D.R. 1-102(A)(6), D.R. 7-102(A)(4), and D.R. 7-102(A)(6), and these charges were dismissed.

With respect to the charge that respondent misrepresented to the insurance company that the proceeds of the [A] claim were an asset of the [A] inter-vivos trust, the hearing committee concluded that

the Disciplinary Counsel had not sustained its charge that this conduct violated D.R. 1-102(A)(4) and D.R. 7-102(A)(5), and recommended that both of these charges be dismissed.

With respect to the backdated trust amendment, the hearing committee concluded that the Disciplinary Counsel had not sustained its charge that respondent violated D.R. 1-102(A)(3), and therefore recommended the dismissal of this charge.

With respect to the charge that respondent's failure to probate the will and to file state inheritance tax returns, the hearing committee concluded that this did not constitute a violation of D.R. 6-101(A)(3), and therefore recommended that it be dismissed.

The report of the hearing committee was filed on April 19, 1982, and recommended that respondent receive an informal admonition.

Petitioner's brief on exceptions was filed on May 10, 1982, and respondent's brief on exceptions was filed on May 21, 1982, and an oral argument panel, composed of Mary Bell Hammerman (Chairperson), Raymond Pearlstine and Robert C. Daniels, was designated to hear oral argument, but in view of injury received by Mary Bell Hammerman, leaving her incapacitated, Pasco L. Schiavo was substituted, and Raymond Pearlstine was designated as Chairman. Argument was heard in the [   ] Office of The Disciplinary Board on August 17, 1982.

## II. STATEMENT OF FACTS.

The board has been favored by a very complete and sensitive report of the hearing committee, portions of which are set forth below because they accurately set forth the factual situation and raise important issues with respect to the type of disci-

pline to be imposed in cases of this nature, which must be addressed.

Respondent, [   ], graduated from the University of [   ] with a Juris Doctor Degree in 1956, and a Doctorate from the University of [   ] in 1962, and with an LL.M. from [   ] University Law School. He was a Sterling Fellow in 1964, and was admitted to practice before the Supreme Court of Pennsylvania in 1972.

In 1966, he was made an Associate Professor at [   ] Law School, and in 1971 he became a Full Professor. He has taught trusts and estates, legal ethics, equity, insurance, comparative law and remedies. He now teaches contracts, comparative law and remedies, and domestic relations.

In mid-March of 1976, [A], approximately 84 years of age, was in the hospital suffering as a result of an accident when he fell in front of the Acme Markets property. Respondent was retained by [A] to represent him in his claim for personal injuries, and also retained to draft his will and an inter-vivos trust. The trust was executed on March 31, 1976, and the will was executed on April 7, 1976.

[A] died on April 26, 1978, and respondent was aware of his death when it occurred. Respondent intentionally failed to notify counsel for the insurance company representing Acme Markets that [A] was deceased. A settlement was reached for $15,000, settled by [B], Esq., who was brought into the case by respondent because he had personal injury experience.

On May 12, 1976, respondent notified Acme Markets' liability insurance carrier, the [C] Insurance Company, of his representation of [A], and notified that he had a lien for attorney's fees and services in the matter. On September 16, 1977, [B] and respondent filed suit in the Court of Common Pleas of

[   ] County. On October 25, 1978, a Claims Agent, [D], discovered that [A] had died on April 26, 1978. In November of 1978, [D] and [B] agreed to settle the case for $15,000. On November 22, 1978, pursuant to that agreement, [D] sent to [B] a letter enclosing a blank release form, which he requested that he have [A] read and sign. This was an error on the part of [D], in that he sent it without realizing at the time that [A] was deceased. After receiving the release, [B] communicated with respondent, and he was advised that [A] died in April of 1978. [B] advised respondent that the normal procedure would be to probate decedent's will, raise an estate, and substitute the executor as personal representative. Respondent advised [B] that this was not necessary because the lawsuit was an asset of the trust. The hearing committee specifically found as a fact that the lawsuit was not an asset of the trust, and that the executor named in the will and the trustee under the trust had no power to add assets to the trust which did not belong to the trustee personally.

Respondent agreed that [B] would sign the release in [A's] name and submit it to the insurance company. [B] signed the release by simulating the fragile signature of a weak and shaky handed individual. The release was signed and mailed on December 1, 1978. [D] brought to the attention of his supervisor the fact that he received a release purportedly signed by decedent, and in December, [C] Insurance Company communicated with [E], Esq., their supervising counsel. Respondent did not advise [D] or anyone else at [C] Insurance Company of [A's] death before October 25, 1978. The purpose of signing the release in the aforementioned manner was to have the insurance company believe that [A] signed it.

As a result of the consultation between [C] Claims Department, [E], and [D], a letter was sent to [B] on December 28, 1978, requesting that letters be obtained and that a personal representative be appointed for the [A] estate in order that payment of settlement proceeds may be made (Exhibits P-7, -11, -12, and -22). Respondent did not probate [A's] will nor advise [F], executor named in the will, to do so. Respondent directed and agreed that [B] file an application for letters of administration on behalf of [F], rather than probate [A's] will. On May 7, 1979, letters of administration were granted to [F], who stated under oath that, "Decedent died intestate."

In July 1979, respondent and [E], Esq., had a telephone conversation in which [E] requested the probate of the [A] will, which resulted in respondent's conclusion that the insurance company "did not know what was going on."

Respondent was highly critical of [E], and concluded that the insurance company did not know what was going on. In the course of a telephone conversation in August of 1979, respondent threatened [E] that he would make a complaint against [G] to the Disciplinary Board of the Supreme Court of Pennsylvania. Respondent's ground for making the aforesaid threat was that he believed [G] to be "sick" or "inflexible." The threat was made to get [G] and [E] to abandon their demands that the will be probated or a bond be obtained.

Notwithstanding respondent's characterization of the inflexibility and stupidity of [E], the demands that a personal representative be appointed, the will be probated, or a probate bond be obtained, were made solely for the purpose of protecting their client against making payment of settlement pro-

ceeds to an unqualified party and subjecting the client to potential double liability.

In July 1979, respondent prepared a document entitled "Amendment to Inter-Vivos Trust," which was executed on March 31, 1976, by [A]. For some reason, it was backdated November 29, 1978, and was signed and otherwise executed by respondent in the name of [A] who was then deceased. This signature simulated the actual signature of [A] to the original trust indenture.

Respondent agreed to assume responsibility for any legal duties with respect to the estate, including the filing of inheritance tax returns after the letters of administration were granted to [F]. Respondent did not file state inheritance tax returns on behalf of the [A] Estate within the time allowable by law, and on December 17, 1979, an order was entered to issue a citation to show cause why the tax returns had not been filed, returnable February 15, 1980. In response to this citation, respondent prepared and filed an inheritance tax return.

[F] had no legal training or experience, and in carrying out his duties as trustee of the trust, [F] relied exclusively and heavily upon the legal advice and counsel of respondent. Respondent knew that [F] relied upon him heavily for legal advice with respect to his duties as trustee and representative of [A's] estate. Respondent gave [F] legal advice concerning the administration of the estate; nevertheless, respondent assumed that [F] would file the state inheritance tax returns.

Respondent knew at all relevant times that no event subsequent to the execution of the trust would relieve the estate of any state inheritance tax liability for which it would otherwise be responsible, and when he prepared the estate plan consisting of the trust and will, and at all subsequent

times, respondent knew that [A's] estate might be subject to state inheritance tax at the time of [A's] death.

When respondent advised [A] concerning the trust instrument, [A's] assets were in the main composed of jointly held bank accounts and other personal property with his wife as tenants-by-the-entireties. By severing the tenancy and dividing the assets belonging to the [A's], he subjected one-half of the value of the estate (estimated at $200,000) to Pennsylvania taxation, which otherwise would have been exempt by virtue of the entireties exemption in the Pennsylvania Inheritance Tax Law. The division of the assets belonging to the [A's] did not avoid the state inheritance tax liability of the [A] estate.

## III. HEARING COMMITTEE RECOMMENDATIONS AND REASONS.

The hearing committee dealt with petitioner's allegation of respondent's misconduct in five separate categories, as follows:

A. The signing of the [A] Release.

The hearing committee concludes that "there is no doubt that the placement of a signature on a release which purported to be [A's] was the placement of a false signature." The hearing committee also found that [D] erroneously sent Mr. [B] a blank release, requesting that [B] have [A] read and sign the release. Respondent, during this period of time, was insisting that the proceeds of the lawsuit was an asset of the trust, and yet if this was truly his belief, he would have had the release signed by [F] as trustee, and this problem would have ended with a speedy settlement and a receipt of the sum of $15,000. While respondent insisted that the trust

was broad enough to include this asset, he nevertheless attempted to rectify the failure to specifically describe it in his exhibit attached to the trust instrument by falsely creating and falsely simulating the signature of decedent [A] to the alleged amendment. The committee recommended the dismissal of the three charges under this description.

The committee should have concluded that respondent knowingly participated in a scheme or plan to prepare false evidence in violation of D.R. 7-102(A)(6); that his conduct involved dishonesty or misrepresentation in violation of D.R. 1-102(A)(4); and that his conduct reflected adversly upon his fitness to practice law in violation of D.R. 1-102(A)(6).

The committee failed to address the question of the nature of respondent's conduct, considering only the effect of the conduct. The committee found that the sole purpose of signing the release, whether it purported to be the act of [A], was to mislead the insurance company into believing that [A] signed it. Notwithstanding this specific finding, the committee nevertheless concluded that the charges should be dismissed. This recommendation should be rejected.

B. Respondent's conduct in misrepresenting to the insurance company that the lawsuit proceeds were an asset of the trust constitutes conduct in violation of D.R. 1-102(A)(4) and D.R. 7-102(A)(5).

The hearing committee dismissed the charges on the grounds that this conclusion was a matter of legal opinion and was made in good faith.

An analysis of the testimony reveals that respondent was aware of the falsity of his representations which gave rise to the preparation of the false Amendment to the Trust (P-26a), and from respon-

dent's own testimony, that prior to [A's] death, he had thought of preparing such an amendment, but for some unexplained reason decided against doing so.

Respondent was aware of the existence of the personal injury claim at the time he prepared the trust, and attached to it a very detailed list of assets which included such small items as the title to a vehicle, wills, and other property in specific detail. Yet, there was no mention in the trust of the claim for damages which were subsequently asserted in the lawsuit. Nor was it added later, as it could have been. Respondent's persistent statements that the suit was an asset of the trust buttressed by apparent attempts at intimidation ranging from stressing his own alleged expertise to threatening opposing counsel with a complaint to The Disciplinary Board do not change that fact.

Finally, respondent's conduct in preparing and submitting the false trust amendment supports the conclusion that he was intentionally seeking to mislead the insurance company on this point. In his July 27 cover letter, respondent stated,

"[A] amended his Trust to specifically include proceeds from any law suit filed by him or by [A's wife] in his interest which might come to him on November 20, 1978." . . . (Amendment to [A's] trust was deemed advisable after we thought of the problem of proceeds from law suits or settlements not contained specifically in the original trust)."

This conduct constituted a violation of D.R. 7-102(A)(5) which provides that in his representation of a client, a lawyer shall not knowingly make a false statement of law or of fact, as well as a violation of D.R. 1-102(A)(4).

The hearing committee properly concluded that

respondent's conduct in backdating the trust and the circumstances surrounding the transmission of this instrument to the insurance company, constituted a violation of D.R. 1-102(A)(6) in that it adversely reflected on respondent's fitness to practice law, and it further violated D.R. 7-102(A)(4) in that he knowingly used false evidence, and that respondent's conduct violated D.R. 7-102(A)(6) in that he created evidence known to be or which was obviously false.

C. Respondent's actions in causing Letters of Administration to be sought.

The hearing committee concluded:

"There is no question that [A] died testate. There is also no question that it was Respondent's opinion—whether correct or erroneous—that it was in the best interests of the estate to avoid probating the will. However legally misguided that may have been, we find no evidence of professional misconduct in Respondent's holding that view, despite the Petitioner's suggestion to the contrary." . . .

"Like Respondent's participation in the backdated trust amendment, in our opinion, this was also professionally irresponsible conduct which cannot be excused on grounds of Respondent's exasperation at the seemingly inept way in which the insurance company had handled the wind-up of the claim. The Petition for Letters of Administration was a solemn legal instrument and court record, prepared under oath by [F] whom Respondent-counsel advised to do so falsely. For Respondent to have lent his professional assistance to such a misrepresentation violated the Code."

The hearing committee properly concluded that respondent's conduct violated D.R. 1-102(A)(4) in that it involved dishonesty, fraud, deceit, or mis-

representation. Further, that it violated D.R. 1-102(A)(6) in that it adversely reflected upon Respondent's fitness to practice law, and D.R. 7-102(A)(3) in that respondent's conduct concealed or knowingly failed to disclose that which is required by law to be revealed. And, finally, his conduct violated D.R. 7-102(A)(5) in that respondent knowingly made a false statement of law or fact.

D. The failure to probate the Will and to file State Inheritance Tax Returns.

Respondent admitted, "I have no intention of probating the will." It was agreed that in some circumstances, it would be unnecessary to probate a will, but where a decedent dies testate, holding property in his own name, it is necessary to probate an existing will to transfer the title to that property. Where that property is an interest in pending litigation, 20 P.S. §3375 provides that if a personal representative is not appointed within a year of death, the action may abate and be subject to dismissal.

A reading of the notes of testimony leads to the inevitable conclusion that respondent's petition that the will need not be probated was not, as the committee found, merely a matter of opinion, which cannot be subjected to disciplinary scrutiny, but was part of a scheme to defraud the state of a considerable sum of money for taxes due on an estate of approximately $200,000. Nevertheless, it was respondent's view that avoidance of probate was in the best interests of the estate.

## V. FINDINGS OF FACT

The board adopts the findings of fact, except finding of fact no. 65, which is not supported by testimony consisting of 79 paragraphs set forth on pages 2 through 13 of the report of the hearing

committee, precis of which has been set forth in the statement of charges, supra.

## V. CONCLUSIONS OF LAW

The Disciplinary Board concludes that evidence of a clear and convincing nature establishes as follows:

A. The signing of the [A] release.

1. In violation of D.R. 7-102(A)(6), respondent knowingly participated in a scheme or plan to prepare false evidence.

2. In violation of D.R. 1-102(A)(4), respondent's conduct involved dishonesty or misrepresentation.

3. In violation of D.R. 1-102(A)(6), his conduct reflected adversely upon his fitness to practice law.

B. Respondent's conduct in misrepresenting to the insurance company that the lawsuit proceeds were an asset of the trust.

1. In violation of D.R. 7-102(A)(5), which provides that in his representation of a client, a lawyer shall not knowingly make a false statement of law or of fact.

2. A violation of D.R. 1-102(A)(4) in that respondent's conduct involved dishonesty or misrepresentation.

3. A violation of D.R. 1-102(A)(6) in that respondent's conduct in backdating the trust and the circumstances surrounding the transmission of this instrument to the insurance company adversely reflected upon respondent's fitness to practice law.

4. A violation of D.R. 7-102(A)(4) in that he knowingly used false evidence.

5. A violation of D.R. 7-102(A)(6) in that respondent created evidence known to be or which was obviously false.

C. Respondent's actions in causing Letters of Administration to be sought.

1.  A violation of D.R. 1-102(A)(4) in that respondent's conduct involved dishonesty, fraud, deceit or misrepresentation.

2.  A violation of D.R. 1-102(A)(6) in that respondent's conduct adversely reflected upon his fitness to practice law.

3.  A violation of D.R. 7-102(A)(3) in that respondent's conduct concealed or knowingly failed to disclose that which is required by law to be revealed.

4.  A violation of D.R. 7-102(A)(5) in that respondent knowingly made a false statement of law or fact.

D. The failure to probate the Will and to file State Inheritance Tax Return.

1.  No evidence of a violation of the Code.

## VI. DISCUSSION

The Disciplinary Board rejects the recommendation of the hearing committee that respondent receive an informal private admonition. On the other hand, the Disciplinary Counsel urged a three-month suspension as the proper discipline to be imposed.

While the hearing committee concedes that the backdating of the trust amendment was professionally irresponsible and deserving of discipline, and that respondent's professional irresponsibility was apparent to anyone who was in a position to observe it, and "that such arrogance in a member of the Bar is intolerable," they nevertheless conclude that since there is no suggestion that respondent profited or tried to profit improperly from any of his professional misconduct, that a three-month suspension from practice would be unduly harsh.

The hearing committee judged respondent as a law professor, but the misconduct was that of a

lawyer performing a disservice to his client. There can be no question but that respondent violated the Disciplinary Rules set forth in the conclusions of law.

What does merit far more extended discussion is the discipline recommended by the hearing committee. One of the primary objectives of the disciplinary system in the Commonwealth of Pennsylvania and the professional staff and volunteers charged with the responsibility of administering it is to assure that the misconduct by an attorney that has lead to disciplinary action will not occur again. This has been accomplished in serious cases by disbarment or suspension which places the burden on the attorney to establish through the reinstatement process that he is able to resume the practice of the law. Informal admonitions administered by Disciplinary Counsel, private reprimands administered by Disciplinary Board, and public censure administered by the Supreme Court are invariably concluded with language warning respondent of the consequences of a repeat offense, but, more importantly, frequently include a discussion and review with the attorney of the causes of his difficulties and the possible means of avoiding them in the future. The board, after careful consideration and discussion, and a review of the report of the hearing commitee, the briefs of petitioner and respondent, concluded that respondent be publicly censured by the Supreme Court. Two members of the board who also served on the panel of oral argument, responded favorably to respondent's counsel's argument that suspension could well destroy his long career as a law professor, a career which has been his principal vocation, and that since respondent has not been found to have violated the code previously, that a private reprimand would

achieve the broad purposes of the disciplinary system.

In re Anonymous, 4 D.B. 78, 10 D. & C. 3d 307 (1979), respondent prepared a bogus decree in divorce, and the court suspended respondent for six months. In Anonymous 20 D.B. 77, 14 D. & C. 3d, 239 (1978), respondent misstated a consideration for real property in order to evade full payment of transfer tax, and he was subjected to public censure.

as reflected by the evidence in the record, and having read and thought through the thorough briefs prepared and filed by petitioner and respondent, the majority of the board is brought to the inevitable conclusion that only a public censure be recommended as the appropriate discipline to be meted out to respondent. The board does not believe that any level of private admonition or reprimand will be sufficiently impressive to respondent, but suspension, no matter how minimal, would not serve the purposes of the disciplinary system.

## VII. PRIOR DISCIPLINE.

Respondent has not been the subject of any prior discipline.

## VIII. RECOMMENDATION.

The Disciplinary Board, at its meeting held on August 25, 1982, voted to recommend a public censure. Two members voted for the imposition of a private reprimand. The recommendation of the hearing committee to impose an informal admonition was not followed. The board further recommends that respondent pay the costs incurred herein.

Messrs. Daniels and Schiavo dissent and would recommend a private reprimand.

## ORDER

And now, October 19, 1982, upon consideration of the recommendation of the Disciplinary Board dated September 29, 1982, it is hereby ordered that [Respondent] be and he is suspended from the Bar of the Commonwealth for a period of three years, and he shall comply with all the provisions of Rule 217 of the Pennsylvania Rules of Disciplinary Enforcement. It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g) of the Pennsylvania Rules of Disciplinary Enforcement.